## ENVIRONMENTAL PROTECTION AGENCY ET AL. v. CALIFORNIA EX REL. STATE WATER RESOURCES CONTROL BOARD ET AL.

No. 74–1435.   Argued January 13, 1976—Decided June 7, 1976

WHITE, J., delivered the opinion of the Court in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. STEWART and REHNQUIST, JJ., filed a dissenting statement, *post,* p. 228.

*Deputy Solicitor General Friedman* argued the cause for petitioners. On the brief were *Solicitor General Bork, Assistant Attorney General Johnson, Deputy Solicitor General Randolph, Edmund B. Clark, Raymond N. Zagone,* and *Robert V. Zener.*

*Roderick Walston,* Deputy Attorney General, argued the cause for respondent State of California. With him on the brief were *Evelle J. Younger,* Attorney General, *Carl Boronkay,* Assistant Attorney General, and *Richard C. Jacobs,* Deputy Attorney General. *Slade Gorton,* Attorney General, argued the cause for respondents

State of Washington et al. With him on the brief were *Charles B. Roe, Jr.*, Senior Assistant Attorney General, and *Charles W. Lean*, Assistant Attorney General.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue in this case which arises under the Federal Water Pollution Control Act Amendments of 1972 (Amendments), 86 Stat. 816, 33 U. S. C. § 1251 *et seq.* (1970 ed., Supp. IV), is whether federal installations discharging water pollutants in a State with a federally approved permit program are to secure their permits from the State, or from the Environmental Protection

---

*Briefs of *amici curiae* urging affirmance were filed by *Louis J. Lefkowitz*, Attorney General, *Samuel A. Hirshowitz*, First Assistant Attorney General, and *Philip Weinberg* and *Richard G. Berger*, Assistant Attorneys General, for the State of New York, joined by *Robert L. Shevin*, Attorney General of Florida, *Warren Spannaus*, Attorney General of Minnesota, *Peter W. Sipkins*, Solicitor General, and *Eldon G. Kaul*, Assistant Attorney General, for the States of Florida and Minnesota; by *Ed W. Hancock*, Attorney General of Kentucky, and *David C. Short* and *David D. Beals*, Assistant Attorneys General, *Arthur K. Bolton*, Attorney General of Georgia, *Ronald Y. Amemiya*, Attorney General of Hawaii, and *William J. Brown*, Attorney General of Ohio, for the Commonwealths of Kentucky and Pennsylvania and the States of Georgia, Hawaii, and Ohio; by *Frank J. Kelley*, Attorney General, *Robert A. Derengoski*, Solicitor General, and *Stewart H. Freeman* and *Charles Alpert*, Assistant Attorneys General, for the State of Michigan; by *V. Frank Mendicino*, Attorney General, *Charles J. Carroll*, Deputy Attorney General, and *Marilyn S. Kite*, Special Assistant Attorney General, for the State of Wyoming; by *Francis B. Burch*, Attorney General, *Henry R. Lord*, Deputy Attorney General, and *Warren K. Rich*, Assistant Attorney General, for the State of Maryland; and by *John L. Hill*, Attorney General of Texas, *David M. Kendall*, First Assistant Attorney General, *Douglas G. Caroom*, Assistant Attorney General, and *Bronson C. LaFollette*, Attorney General of Wisconsin, for the States of Texas and Wisconsin.

Agency (EPA). As with the related Clean Air Act issue decided this day in *Hancock* v. *Train, ante,* p. 167, decision of the specific statutory question—whether obtaining a state permit is among those "requirements respecting control and abatement of pollution" with which federal facilities must comply under § 313 of the Amendments [1]— is informed by constitutional principles governing submission of federal installations to state regulatory authority.

## I

Before it was amended in 1972, the Federal Water Pollution Control Act [2] employed ambient water quality standards specifying the acceptable levels of pollution in a State's interstate navigable waters as the primary mechanism in its program for the control of water pollution.[3] This program based on water quality standards, which were to serve both to guide performance by polluters and to trigger legal action to abate pollution, proved ineffective. The problems stemmed from the character of the standards themselves, which focused on the tolerable effects rather than the preventable causes of water pollution, from the awkwardly shared federal and state responsibility for promulgating such standards,[4] and from the cumbrous enforcement procedures. These combined to make it very difficult to develop and

---

[1] 33 U. S. C. § 1323 (1970 ed., Supp. IV).

[2] The Act was first passed in 1948, Act of June 30, 1948, 62 Stat. 1155, and has been frequently revised. See annotation following 33 U. S. C. § 1251 (1970 ed., Supp. IV). Before the 1972 Amendments the Act was codified at 33 U. S. C. § 1151 *et seq.*

[3] 79 Stat. 907, as amended, 33 U. S. C. § 1160 (c).

[4] The States were to promulgate water quality standards and an implementation plan meeting certain criteria. 33 U. S. C. §§ 1160 (c)(1), (3). If a State did not establish such standards and a plan, the Administrator was charged to promulgate water quality standards—but not a plan—in cooperation with state officials. 33 U. S. C. §§ 1160 (c)(2), (4).

enforce standards to govern the conduct of individual polluters.

Some States developed water quality standards and plans to implement and enforce them, and some relied on discharge permit systems for enforcement. Others did not, and to strengthen the abatement system federal officials revived the Refuse Act of 1899, § 13, 30 Stat. 1152, 33 U. S. C. § 407, which prohibits the discharge of any matter into the Nation's navigable waters except with a federal permit.[5] Although this direct approach to water pollution abatement proved helpful, it also was deficient in several respects: The goal of the discharge permit conditions was to achieve water quality standards rather than to require individual polluters to minimize effluent discharge, the permit program was applied only to industrial polluters, some dischargers were required to obtain both federal and state permits, and federal permit authority was shared by two federal agencies.[6]

In 1972, prompted by the conclusion of the Senate Committee on Public Works that "the Federal water pollution control program . . . has been inadequate in every vital aspect,"[7] Congress enacted the Amendments, declaring "the national goal that the discharge of pollutants into the navagible waters be *eliminated* by 1985."[8]

---

[5] See Exec. Order No. 11574, 3 CFR 986 (1966–1970 Comp.). See also 84 Stat. 108, 33 U. S. C. § 1171 (b).

[6] S. Rep. No. 92–414, p. 5 (1971), 2 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93–1, p. 1423 (1973) (hereafter Leg. Hist.).

[7] S. Rep. No. 92–414, *supra,* at 7, 2 Leg. Hist. 1425.

[8] § 101 (a)(1), 33 U. S. C. § 1251 (a)(1) (1970 ed., Supp. IV) (emphasis added). Previously the purpose of the Act had been "to enhance the quality and value of our water resources and to establish a national policy for the prevention, control, and abatement of water pollution." 33 U. S. C. § 1151 (a).

For present purposes the Amendments introduced two major changes in the methods to set and enforce standards to abate and control water pollution. First, the Amendments are aimed at achieving maximum "effluent limitations" on "point sources," as well as achieving acceptable water quality standards. A point source is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged."[9] An "effluent limitation" in turn is "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources . . . including schedules of compliance."[10] Such direct restrictions on discharges facilitate enforcement by making it unnecessary to work backward from an overpolluted body of water to determine which point sources are responsible and which must be abated. In addition, a discharger's performance is now measured against strict technology-based[11] effluent limitations—specified levels of treatment—to which it must conform, rather than against limitations derived from water

---

[9] § 502 (14), 33 U. S. C. § 1362 (14) (1970 ed., Supp. IV). The terms "pollutant" and "discharge of pollutant" are defined in §§ 502 (6), (12), 33 U. S. C. §§ 1362 (6), (12) (1970 ed., Supp. IV).

[10] § 502 (11), 33 U. S. C. § 1362 (11) (1970 ed., Supp. IV). Section 502 (17) defines a "schedule of compliance" to be "a schedule of remedial measures including an enforceable sequence of actions or operations leading to compliance with an effluent limitation, other limitation, prohibition, or standard." 33 U. S. C. § 1362 (17) (1970 ed., Supp. IV).

[11] Point sources other than publicly owned treatment works must achieve effluent limitations requiring application of the "best practicable control technology currently available" by July 1, 1977, and application of the "best available technology economically achievable" by July 1, 1983. §§ 301 (b) (1) (A), (2) (A), 33 U. S. C. §§ 1311 (b) (1) (A), (2) (A) (1970 ed., Supp. IV).

quality standards to which it and other polluters must collectively conform.[12]

Second, the Amendments establish the National Pollutant Discharge Elimination System (NPDES)[13] as a means of achieving and enforcing the effluent limitations. Under the NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms.[14] An NPDES permit serves to transform generally applicable effluent limitations and other standards—including those based on water quality—into the obligations (including a timetable for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits. §§ 309 and 505, 33 U. S. C. §§ 1319 and 1365 (1970 ed., Supp. IV). With few exceptions, for enforcement purposes a discharger in compliance with the terms and conditions of an NPDES permit is deemed to be in compliance with those sections of the Amendments on which the permit conditions are based. § 402 (k), 33 U. S. C. § 1342 (k) (1970 ed., Supp. IV). In short, the permit defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations under the Amendments.

---

[12] Water quality standards are retained as a supplementary basis for effluent limitations, however, so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels. See §§ 301 (e), 302, 303, 33 U. S. C. §§ 1311 (e), 1312, 1313 (1970 ed., Supp. IV).

[13] § 402, 33 U. S. C. § 1342 (1970 ed., Supp. IV).

[14] Section 301 (a), 33 U. S. C. § 1311 (a) (1970 ed., Supp. IV), makes unlawful "the discharge of any pollutant by any person" except in compliance with numerous provisions of the Amendments, including § 402 which establishes the NPDES.

In effect, the NPDES terminates operation of the Refuse Act permit program. §§ 402 (a)(4), (5), 402 (k), 33 U. S. C. §§ 1342 (a)(4), (5), 1342 (k) (1970 ed., Supp. IV).

NPDES permits are secured, in the first instance, from the EPA, which issues permits under the authority of § 402 (a)(1), 33 U. S. C. § 1342 (a)(1) (1970 ed., Supp. IV). Section 402 (a)(3) requires the EPA permit program and permits to conform to the "terms, conditions, and requirements" of § 402 (b).[15] Consonant

---

[15] 33 U. S. C. § 1342 (a)(3) (1970 ed., Supp. IV). Section 402 (b) provides:

"At any time after the promulgation of the guidelines required by subsection (h)(2) of section 304 of this Act, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each such submitted program unless he determines that adequate authority does not exist:

"(1) To issue permits which—

"(A) apply, and insure compliance with, any applicable requirements of sections 301, 302, 306, 307, and 403;

"(B) are for fixed terms not exceeding five years; and

"(C) can be terminated or modified for cause including, but not limited to, the following:

"(i) violation of any condition of the permit;

"(ii) obtaining a permit by misrepresentation, or failure to disclose fully all relevant facts;

"(iii) change in any condition that requires either a temporary or permanent reduction or elimination of the permitted discharge;

"(D) control the disposal of pollutants into wells;

"(2)(A) To issue permits which apply, and insure compliance with, all applicable requirements of section 308 of this Act, or

"(B) To inspect, monitor, enter, and require reports to at least the same extent as required in section 308 of this Act;

"(3) To insure that the public, and any other State the waters of

with its policy "to recognize, preserve, and protect the primary responsibilities and rights of States to prevent,

---

which may be affected, receive notice of each application for a permit and to provide an opportunity for public hearing before a ruling on each such application;

"(4) To insure that the Administrator receives notice of each application (including a copy thereof) for a permit;

"(5) To insure that any State (other than the permitting State), whose waters may be affected by the issuance of a permit may submit written recommendations to the permitting State (and the Administrator) with respect to any permit application and, if any part of such written recommendations are not accepted by the permitting State, that the permitting State will notify such affected State (and the Administrator) in writing of its failure to so accept such recommendations together with its reasons for so doing;

"(6) To insure that no permit will be issued if, in the judgment of the Secretary of the Army acting through the Chief of Engineers, after consultation with the Secretary of the department in which the Coast Guard is operating, anchorage and navigation of any of the navigable waters would be substantially impaired thereby;

"(7) To abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement;

"(8) To insure that any permit for a discharge from a publicly owned treatment works includes conditions to require adequate notice to the permitting agency of (A) new introductions into such works of pollutants from any source which would be a new source as defined in section 306 if such source were discharging pollutants, (B) new introductions of pollutants into such works from a source which would be subject to section 301 if it were discharging such pollutants, or (C) a substantial change in volume or character of pollutants being introduced into such works by a source introducing pollutants into such works at the time of issuance of the permit. Such notice shall include information on the quality and quantity of effluent to be introduced into such treatment works and any anticipated impact of such change in the quantity or quality of effluent to be discharged from such publicly owned treatment works; and

"(9) To insure that any industrial user of any publicly owned treatment works will comply with sections 204 (b), 307, and 308." 86 Stat. 880, 33 U. S. C. § 1342 (b) (1970 ed., Supp. IV).

See also § 303 (e), 33 U. S. C. § 1313 (e) (1970 ed., Supp. IV).

reduce, and eliminate pollution," [16] Congress also provided that a State may issue NPDES permits "for discharges into navigable waters within its jurisdiction," but only upon EPA approval of the State's proposal to administer its own program. The EPA may require modification or revision of a submitted program but when a plan is in compliance with the EPA's guidelines under § 304 (h)(2), 33 U. S. C. § 1314 (h)(2) (1970 ed., Supp. IV), and is supported by adequate authority to achieve the ends of §§ 402 (b)(1)–(9), n. 15, *supra,* and to administer the described program, the EPA shall approve the program and "suspend the issuance of permits under [§ 402 (a)] as to those navigable waters subject to such program." [17]

The EPA retains authority to review operation of a State's permit program. Unless the EPA waives review for particular classes of point sources or for a particular permit application, §§ 402 (d)(3), (e), 33 U. S. C. §§ 1342 (d)(3), (e) (1970 ed., Supp. IV), a State is to forward a copy of each permit application to the EPA for review, and no permit may issue if the EPA objects that issuance of the permit would be "outside the guidelines and requirements" of the Amendments. §§ 402 (d) (1), (2), 33 U. S. C. §§ 1342(d)(1), (2) (1970 ed., Supp. IV). In addition to this review authority, after notice and opportunity to take action, the EPA may withdraw approval of a state permit program which is not being administered in compliance with § 402. § 402 (c)(3), 33 U. S. C. § 1342 (c)(3) (1970 ed., Supp. IV).

---

[16] § 101 (b), 33 U. S. C. § 1251 (b) (1970 ed., Supp. IV).

[17] § 402 (c)(1), 33 U. S. C. § 1342 (c)(1) (1970 ed., Supp. IV). Title 40 CFR § 124.2 (b) (1975) provides that upon approving a state permit program EPA "shall suspend [its] issuance of NPDES permits as to those point sources subject to such approved program."

The Amendments also sought to enlist "every Federal agency . . . to provide national leadership in the control of water pollution in [its] operations."[18]  To do so, 33 U. S. C. § 1171 (a), which required federal agencies, "consistent with the paramount interest of the United States as determined by the President [to] insure compliance with applicable water quality standards," was amended by adding § 313,[19] providing that federal installations must "comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements."  33 U. S. C. § 1323 (1970 ed., Supp. IV).

## II

On May 14, 1973, the Acting EPA Administrator approved the State of California's request to administer its own NPDES permit program and, effective that date, suspended EPA issuance of all permits for "all discharges in the State of California, other than those from agencies and instrumentalities of the Federal government."  App. 18.  Soon after this first approval of a state program and after correspondence exchanging views on a State's authority to issue permits to federal installations, the EPA informed the State of Washington that it "does not have the prerogative to delegate permit issuance for Federal facilities to any state."  *Id.*, at 6.  Shortly

---

[18] S. Rep. No. 92–414, *supra*, at 67, 2 Leg. Hist. 1485.  See H. R. Rep. No. 92–911, pp. 118–119 (1972), 1 Leg. Hist. 805–806.

[19] In 1970, 84 Stat. 107, 33 U. S. C. § 1171 (a), itself had amended the original measure, 70 Stat. 506, as amended, which had admonished federal agencies, "insofar as practicable and consistent with the interests of the United States and within any available appropriations, [to] cooperate" with federal and state officials "in preventing or controlling" water pollution.  33 U. S. C. § 466h (1964 ed., Supp. V).  Cf. 42 U. S. C. § 1857f (a) (1964 ed., Supp. V) (Clean Air Act).

thereafter the State of Washington's permit program was rejected as "missing important components," *id.*, at 7, the EPA reaffirming its position that it had "sole authority to issue permits to federal facilities." *Id.*, at 25.

California and Washington filed petitions for review under § 509 (b)(1), which authorizes a court of appeals to review "the Administrator's action . . . (D) in making any determination as to a State permit program submitted under section 402 (b)." [20] The two States argued that § 313 authorized States with approved NPDES permit programs to require federal dischargers to obtain state permits. The States also argued that § 402 gave the EPA no authority to suspend operation of its permit program in a State only for nonfederal dischargers. The Court of Appeals agreed. Mindful of "strong structural and terminological similarities between the Clean Air Act and the 1972 Water Pollution Control Act Amendments" and of the division in the Courts of

---

[20] 33 U. S. C. § 1369 (b)(1)(D) (1970 ed., Supp. IV). The California petition challenged "the failure of the Administrator to approve the California permit program . . . insofar as it applies to agencies and instrumentalities of the Federal government." App. 16. Washington's petition for review challenged the EPA's refusal to consider for approval that portion of its submitted program which "included a provision that discharges of pollutants to navigable waters from federal facilities were covered by the state program." *Id.*, at 25.

Washington's resubmitted permit program was approved after its petition for review was filed, the EPA suspending issuance of EPA permits for "all discharges in the State of Washington other than those from agencies and instrumentalities of the Federal Government." *Id.*, at 29. Washington then filed an additional petition for review in the Court of Appeals. *Id.*, at 32.

The Court of Appeals rejected the EPA's claim that § 509 (b)(1) (D) did not give the court jurisdiction to review the Administrator's actions. The EPA has not pursued that argument in this Court.

Appeals as to the meaning of § 118 of the Clean Air Act,[21] the court found in the Amendments several measures, which it thought had no counterpart in the Clean Air Act and which in its view indicated that federal dischargers were subject to state permit requirements. However the Clean Air Act issue might be resolved, the court concluded that those other indications in the Amendments were sufficiently clear to satisfy the appropriate constitutional conditions for subjecting federal installations to state regulation, and held that federal installations were required to secure state NPDES permits. 511 F. 2d 963, 973 (CA9 1975). We granted the EPA's petition for certiorari, 422 U. S. 1041 (1975), and now reverse the judgment of the Court of Appeals.

## III

Our decision in this case is governed by the same fundamental principles applied today in *Hancock* v. *Train, ante,* at 179: Federal installations are subject to state regulation only when and to the extent that congressional authorization is clear and unambiguous. As in *Hancock* v. *Train,* we must determine whether Congress has subjected federal installations to the degree of state control urged by the States. The only section of the Amendments expressly obliging federal installations to comply with general measures to abate water pollution[22] is § 313, which provides in part:

> "Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction

---

[21] See *Hancock* v. *Train, ante,* at 177, and n. 29.

[22] Cf. §§ 306 (b)(3), (e), 307 (d), 33 U. S. C. §§ 1316 (b)(3), (e), 1317 (d) (1970 ed., Supp. IV).

over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants shall comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements, including the payment of reasonable service charges." 86 Stat. 875, 33 U. S. C. § 1323 (1970 ed., Supp. IV).

Except for the reference to service charges, § 313 is virtually identical to § 118 of the Clean Air Act, 42 U. S. C. § 1857f.[23] Taken alone, § 313, like § 118 of the Clean Air Act, states only to what extent—the same as any person—federal installations must comply with applicable state requirements. Section 313 does not expressly provide that federal dischargers must obtain state NPDES permits. Nor does § 313 or any other section of the Amendments expressly state that obtaining a state

_____

[23] Like § 118 of the Clean Air Act, see *Hancock* v. *Train, ante,* at 182 n. 41, § 313 goes on to authorize the President, upon a determination that it is "in the paramount interest of the United States to do so" and subject to several limitations, to exempt certain federal point sources from "compliance with any such a requirement." Any exemptions granted must be reported annually to the Congress. The President may grant no exemptions from the requirements of §§ 306 and 307 of the Amendments, 33 U. S. C. §§ 1316, 1317 (1970 ed., Supp. IV), which provide, respectively, for standards of performance regulating "new sources" of water pollution and for effluent standards regulating the discharge of "toxic pollutants" and the pretreatment of the discharges introduced into "treatment works," defined in § 212 (2) (A), 33 U. S. C. § 1292 (2) (A) (1970 ed., Supp. IV). Like § 118 of the Clean Air Act, § 313 allows exemptions for lack of appropriations only when the Congress has failed to make a specific appropriation requested as a part of the budgetary process. Cf. 33 U. S. C. § 466h (1964 ed., Supp. V), n. 19, *supra.*

NPDES permit is a "requirement respecting control and abatement of pollution." [24]

The EPA's position is that the Amendments make clear "only that facilities of the executive, legislative and judicial branches operating within the states must comply with the applicable effluent limitations and compliance schedules promulgated by the particular state pursuant to its E. P. A.-approved implementation plan," as incorporated in EPA-issued permits, not that they comply with "state regulations demanding that sources of discharges—including federal facilities—obtain discharge permits." [25] The States claim that this distinction "between permits and effluent 'limitations' . . . ignores the fact that the mechanism by which such 'limitations' are formulated and applied to individual dischargers is by the permit system established in section 402." [26] From this the States, recognizing that § 313 itself does not subject federal dischargers to their permit programs, derive their principal argument that a State's authority to subject federal installations to its EPA-approved permit program must be implied from the practical needs of administering an NPDES permit program, and that this implication is sufficiently clear to satisfy the governing constitutional standard. In their view, the EPA's agree-

---

[24] The Court of Appeals appeared to recognize as much; for even after comparing § 313 with its predecessor, 33 U. S. C. § 1171 (a), which "had required only that federal agencies comply with 'applicable water quality standards,' without specifying whether compliance was limited to the substantive content of the 'standards' referred to, and without specifying whether those standards included state standards," the court also concluded that the enactment of § 313 in and of itself would not sustain an inference that federal installations were to secure state permits. 511 F. 2d 963, 967.

[25] Brief for Petitioners 17, 18.

[26] Brief for Respondent California 5.

ment that the States have authority to develop and set
the substantive content of permits issued to federal dis-
chargers is an empty concession; without being able to
subject federal installations to its own NPDES program
a State is without effective means to formulate and ap-
ply the conditions which the EPA must make part of the
permit for each individual source.

Congress used virtually the same language in § 313
as in § 118 of the Clean Air Act; and our conclusion in
*Hancock* v. *Train, ante,* p. 167, that the Clean Air Act is
without clear indication that Congress intended federal
installations emitting air pollutants to be subject to the
permit program of a State's implementation plan makes
it difficult for the States to establish that for similar
purposes the same language becomes sufficiently clear
in § 313 of the Amendments. There are, of course,
significant differences between the Clean Air Act and
the Amendments. Only the Amendments expressly pro-
vide for a permit program to aid in abating pollution.
In comparison with the Clean Air Act, the Amendments
give the EPA a more prominent role in relation to the
States; a State is not required to develop an NPDES
permit program, and until a State does develop a permit
program *all* dischargers in the State are subject to a per-
mit program developed and carried out by the EPA.
In addition, under the Amendments the EPA's role
in developing the effluent limitations that serve as
the basis for a State's NPDES permit conditions [27] is
more prominent than in developing the ambient air qual-

---

[27] The precise relation between "guidelines for effluent limitations"
to be promulgated by the EPA under § 304 (b), 33 U. S. C.
§ 1314 (b) (1970 ed., Supp. IV), and the several degrees of § 301
effluent limitations which are to be achieved by 1977 and 1983,
respectively, see n. 11, *supra,* is at issue in No. 75–978, *E. I. du Pont
de Nemours & Co.* v. *Train,* cert. granted, 425 U. S. 933 (1976).

ity standards which are the foundation of the emission standards in a State's Clean Air Act implementation plan. In the aggregate, these differences tend to support the EPA's position and in any event they hardly require a conclusion contrary to *Hancock* v. *Train*, particularly since, in the Court of Appeals' words, "certain parts of the legislative history would seem to indicate that the 'requirements' language of Section 313 refers simply and solely to substantive" standards, to effluent limitations and standards and schedules of compliance. 511 F. 2d, at 969.[28]

---

[28] In both the Senate bill, S. 2770, 92d Cong., 1st Sess. (1971), 2 Leg. Hist. 1676–1677, and the House amendment, as reported, H. R. 11896, 92d Cong., 2d Sess. (1972), 1 Leg. Hist. 1040–1041, § 313 provided that federal installations must "comply with Federal, State, interstate, and local requirements respecting control and abatement of [water] pollution to the same extent that any person is subject to such requirements, including the payment of reasonable service charges." (The House version, like § 313 as enacted, did not include the bracketed word.) In the Report accompanying S. 2770, § 313 was described as

"requir[ing] that Federal facilities meet the same *effluent limitations* as private sources of pollut[i]on, unless the Federal facility is specifically exempted by the President. . . . This section requires that Federal facilities meet all *control requirements* as if they were private citizens." S. Rep. No. 92–414, *supra*, at 67, 2 Leg. Hist. 1485 (emphasis added).

Later, in relating how § 313 provides that the President may exempt certain federal sources from "such requirements," the Report explained the requirements from which a federal facility may be exempted in terms of controlling its pollution, controlling actual physical discharge:

"The Committee recognizes, however, that it may be in the paramount interest of the United States that a plant or facility not achieve full water pollution control within the time required." S. Rep. No. 92–414, *supra*, at 68, 2 Leg. Hist. 1486.

The House Report also first described the "requirements" of § 313 as "effluent limitations":

"This section requires that Federal facilities meet the same efflu-

With these obstacles to the States' position in mind, we examine the reasons which collectively led the Court of Appeals to conclude and the States to contend that the Amendments clearly require federal installations to secure state NPDES permits. The Court of Appeals first concluded that such an implication appears in the final phrase of the first sentence of § 313—"including the payment of reasonable service charges." This language, it is argued, must refer to charges incident to a state permit program: If payment of such charges is a "requirement," it must be that Congress intended federal installations to secure state NPDES permits, for there would be no reason to order federal installations to pay fees for a permit which they are not required to obtain. However, the legislative history of § 313 casts no light on the meaning of this clause,[29] and it is not immedi-

ent limitations, other limitations, performance standards, toxic effluent standards and thermal discharge regulations as private sources of pollution . . . ." H. R. Rep. No. 92–911, *supra*, at 118, 1 Leg. Hist. 805.

The absence of any reference to federal facilities' securing a state NPDES permit—respondent California agrees the "reports are silent with respect to the issues in this case" (Brief 40)—continues through the Conference Report which indicates that there were no differences to be resolved between the House and Senate versions of § 313. The Report summarized the Senate bill as "requir[ing] Federal facilities to meet the same effluent limitations as other sources of pollution" and the House amendment as requiring them "to meet the same requirements as private sources of pollution." S. Conf. Rep. No. 92–1236, p. 135 (1972), 1 Leg. Hist. 318.

[29] The Court of Appeals, 511 F. 2d, at 969–970, found the legislative history of § 313 silent on the meaning of the clause. The States' only support for their construction of the clause is the "recollection" of one of the members of the Senate Public Works Committee, expressed in September 1974, nearly two years after the Amendments were enacted and while this litigation was pending in the Court of Appeals, that the language was intended to authorize a federal agency to pay a fee to the State as a part of the

ately clear from the face of § 313 that the phrase does refer to application and service charges associated with an NPDES permit program. Indeed, the term "service charges" might as well be taken to refer to recurring charges for performing a service such as treating sewage, as to fees for accepting and processing a permit application. The EPA so reads the statute and it is not an unreasonable construction.[30] At the very least, the "service charges" language hardly satisfies the rule that federal agencies are subject to state regulation only when and to the extent Congress has clearly expressed such a purpose.

The Court of Appeals also found textual support for its conclusion in § 510 of the Amendments.[31] This

requirement that it obtain a state discharge permit. Brief for Respondent California 24 n. 24; Brief for Respondent Washington 20 n. 15, both citing 120 Cong. Rec. 31216 (1974) (remarks of Sen. Baker).

[30] The EPA explains that the absence of such direction or clarification in the Clean Air Act supports its position, because there are no sewers to carry away air emissions and hence no comparable services for which to make clear that appropriate charges may be levied.

[31] "Except as expressly provided in this Act, nothing in this Act shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; except that if an effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance is in effect under this Act, such State or political subdivision or interstate agency may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than the effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance under this Act; or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 86 Stat. 893, 33 U. S. C. § 1370 (1970 ed., Supp. IV).

section, which is patterned after § 116 of the Clean Air Act,[32] provides that the States may set more restrictive standards, limitations, and requirements than those imposed under the Amendments.[33] Section 510 quite plainly was intended to strengthen state authority. It may also have been intended to permit the States to impose stricter standards and effluent limitations on federal installations than would have been imposed under an EPA permit in the absence of an approved state NPDES program. But this hardly answers the question before us, which is whether these higher standards are to be enforced through a state rather than an EPA permit system. It is nevertheless argued that the meaning of the phrase "requirements respecting control and abatement of pollution" used in § 313 is informed by its use in § 510, an argument akin to one made and rejected in *Hancock* v. *Train, ante,* at 186–187, n. 47. We reject it here for much the same reasons: The phrase cannot have the same meaning in both sections, and there is scant reason to credit the States' position that treating "standards" and "requirements" disjunctively in § 510 somehow dictates that "requirements" in § 313 shall embrace more than "standards."

Another contention drawing upon § 510 is that a State's authority to impose stricter substantive standards on federal installations is meaningless if a State cannot subject federal dischargers to its permit system. This is simply an adjunct[34] to the States' primary argument

---

[32] 42 U. S. C. § 1857d–1, quoted in *Hancock* v. *Train, ante,* at 186–187, n. 47. The Court of Appeals was in error when it stated, 511 F. 2d, at 973, that § 510 had "no counterpart" in the Clean Air Act.

[33] S. Conf. Rep. No. 92–1236, *supra,* at 148, 1 Leg. Hist. 331. See S. Rep. No. 92–414, *supra,* at 85, 2 Leg. Hist. 1503; H. R. Rep. No. 92–911, *supra,* at 136, 1 Leg. Hist. 823.

[34] See n. 35, *infra.*

that no state NPDES permit system can function effectively unless federal dischargers are required to obtain state permits and that federal installations are therefore impliedly, but clearly subject to state permit programs. We cannot agree.

Before a State has its NPDES program approved, it is the EPA which issues permits for *all* dischargers, federal and nonfederal. Since the Amendments do not require the States to develop NPDES programs, we must assume that the Congress was satisfied that the EPA could administer the program, not only by promulgating the nationwide effluent limitations and other standards required by the Amendments, but also by translating those limitations into the conditions of individual permits for individual federal and nonfederal dischargers. We must also assume that the Congress contemplated that there may be some States, which would elect not to develop an NPDES program but would nonetheless determine—as § 510 permits—to adopt water quality standards or other limitations stricter than those the EPA itself had promulgated and would otherwise apply. This being the case, Congress must have contemplated that the EPA was capable of issuing permits in that State—to both federal and nonfederal dischargers—and of enforcing those stricter standards. Some of those standards—in fact all but those pegged to the quality of the receiving waters—could be translated into permit conditions for each discharger without coordinating the conditions in other permits, because the effluent limitations in the Amendments are technology based and the timetable by which compliance is to be achieved is not made to depend on the performance of other dischargers. Other standards, primarily those involving water quality standards, would require coordination among the permit conditions of numerous polluters—federal and nonfed-

eral, and it is evident that Congress contemplated that the EPA was capable of carrying out this function as well.

The presence of the EPA as a permit-issuing authority means that although federal dischargers are not securing state NPDES permits they are nevertheless being subjected to the administrative authority of a federal agency which is required to make a State's "more stringent limitation[s], including those necessary to meet water quality standards, treatment standards, or schedules of compliance" part of the conditions of the permits it must issue.[35] We recognize that there may be some problems of coordination between the EPA and the state pollution control agency in the implementation of state water quality standards. State officials may view the EPA implementation of a State's—or its own—water quality standards as placing a disproportionate share of the additional abatement effort on the nonfederal dischargers in the State, thereby obligating the State to impose undesirably restrictive effluent limitations on those nonfederal—predominantly private—dischargers. At the same time, Congress might have been apprehensive that

---

[35] Through § 402 (a) (2), § 402 (b) (1) (A) requires the Administrator to "prescribe conditions for . . . permits to assure compliance with the requirements" of § 301, just as it requires a state NPDES permit to include such conditions. See *supra,* at 206–208, and n. 15. Section 301 (b) provides in part:

"[T]here shall be achieved—

"(1) . . .

"(C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (*under authority preserved by section 510*) or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this Act." 86 Stat. 844, 33 U. S. C. § 1311 (b) (1) (C) (1970 ed., Supp. IV) (emphasis added).

state regulatory officials, if in the position to do so, would impose a disproportionate share of the burden on federal dischargers. However that may be, we believe that these possible problems of coordination in the administration of water quality standards fail to provide an adequate basis for finding a clear congressional intention to subject federal dischargers to the degree of control inherent in adhering to state permit requirements respecting water quality standards.[36]

The States make several other arguments in support of their position that Congress intended federal dischargers to be subject to state NPDES permit programs, that "requirements" in § 313 include securing a state NPDES permit. We find none of them persuasive. They assert that since the EPA's authority to issue permits to federal dischargers stems at least in part from § 313, it is "capricious" to conclude that the word "requirements" in § 313 refers to permits issued by the EPA under § 402 (a), but not to permits issued by a State under § 402 (b). The answer to this argument is that the EPA's authority to issue permits to federal as well

---

[36] Respondent California argues that the obligation of federal dischargers to meet state effluent limitations necessarily implies state power to subject them, in turn, to state schedules of compliance, state administrative hearings to determine those schedules of compliance, and therefore to the entire gantlet of state permit proceedings and finally to the permit itself. Brief 32–37. The defect in this argument is its opening assertion that federal dischargers must comply with a State's *individualized* effluent limitations, that is, permit conditions such as compliance schedules. We think that the EPA is correct that federal dischargers are to be governed only by the same general effluent limitations and other standards and compliance schedules as other polluters, as embodied in EPA permits, and that in issuing permits to federal dischargers the EPA is to treat federal dischargers under its NPDES program in the same way the State would treat nonfederal dischargers under its program.

as nonfederal dischargers is granted by § 402 (a), not § 313. Nor does the "requirement" that a federal discharger secure a permit stem from § 313; that also arises from § 402 (a) alone.[37]

The States, like the Court of Appeals, 511 F. 2d, at 973, also find support for their position in § 505 of the Amendments, 33 U. S. C. § 1365 (1970 ed., Supp. IV), which provides that a citizen may commence civil actions in district court "against any person (including . . . the United States . . .) who is alleged to be in violation of . . . an effluent standard or limitation under this Act . . . ." § 505 (a)(1), 33 U. S. C. § 1365 (a)(1) (1970 ed., Supp. IV). One of the definitions of "effluent standard or limitation" for purposes of § 505 is "a permit or condition thereof issued under section 402 of this Act, which is in effect under this

---

[37] The authority to require permits rests on § 402 alone, not on § 301 (a); and it was under § 402 that the Administrator issued his regulation subjecting federal instrumentalities to the EPA permit system. 40 CFR §§ 125.2 (a)(2), (b) (1975), 38 Fed. Reg. 13528 (1973). Section 301 (a) simply makes it "unlawful" for "any person" not to have the required permit. That federal agencies, departments, and instrumentalities are not "persons" within the meaning of § 301 (a) and the Amendments, see § 502 (5), 33 U. S. C. § 1362 (5) (1970 ed., Supp. IV), does not mean either that federal dischargers are not required to secure NPDES permits, or that their obligation to secure an NPDES permit derives from a different provision of the Amendments. A federal discharger without a permit is no less out of compliance with § 402 than a nonfederal discharger; the federal discharge is however not "unlawful." Section 309 of the Amendments, 33 U. S. C. § 1319 (1970 ed., Supp. IV), which provides for federal enforcement of the Amendments, mirrors § 301 (a)'s differing treatment of federal and nonfederal sources. Section 309 (a)(3), for example, provides for the EPA to issue orders to "persons" in violation of, *inter alia,* § 301 and to bring a civil action under § 309 (b), 33 U. S. C. § 1319 (b) (1970 ed., Supp. IV). See also §§ 306 (e), 307 (d), 505 (f)(1), 33 U. S. C. §§ 1316 (e), 1317 (d), 1365 (f)(1) (1970 ed., Supp. IV).

Act (including a requirement applicable by reason of section 313 of this Act)." § 505 (f) (6), 33 U. S. C. § 1365 (f) (6) (1970 ed., Supp. IV). California reads § 505 (f) to equate a "requirement" under § 313 with a permit issued under § 402, as if § 505 (f) (6) were phrased: "any permit or condition thereof issued under Section 402 of this Act, which is in effect under this Act (including one issued to a federal discharger)." In a similar vein, Washington asserts that "[c]itizens may bring suit to enforce permits issued under Section 402," including "permits and conditions thereof applicable because of Section 313." Brief 18. It is more reasonable, however, to interpret "requirement" in the parenthetical expression in § 505 (f) (6) as referring principally to a "condition," not to a "permit." This is because of the Amendments' primary reliance on the NPDES as a means to abate and control water pollution. See *supra*, at 205. For enforcement purposes § 402 (k) deems a permit holder who is in compliance with the terms of its permit to be in compliance "with sections 301, 302, 306, 307, and 403, except any standard imposed under section 307 for a toxic pollutant injurious to human health." 33 U. S. C. § 1342 (k) (1970 ed., Supp. IV). Thus, the principal means of enforcing the pollution control and abatement provisions of the Amendments is to enforce compliance with a permit. Of the six subdivisions of § 505 (f) defining "effluent standard or limitation," only § 505 (f) (6) refers to any of the standards or limitations *as translated into the conditions of an NPDES permit.* Thus, while §§ 505 (f) (2)–(4) permit suits for violation of effluent standards or limitations promulgated under §§ 301, 302, 306, and 307, a suit against a permit holder will necessarily be brought under the definition in § 505 (f) (6); unless the plaintiff can show violation of the permit condition, violation of the Amendments cannot be established. This is true both

for conditions imposed in accordance with EPA–promulgated effluent limitations and standards and for those imposed in accordance with more stringent standards and limitations established by a State pursuant to § 510. The reference in § 505 (f)(6) to requirements applicable by reason of § 313 is to be read as making clear that *all* dischargers (including federal dischargers) may be sued to enforce permit conditions, whether those conditions arise from standards and limitations promulgated by the Administrator or from stricter standards established by the State.[38]   In short, we cannot accept the States' position that the meaning of "requirements" in § 313 they urge is supported by its use in § 505 (f)(6).

Finally, it is argued that when a State submits a plan in conformity with § 402, the EPA must approve it and must then suspend the issuance of all EPA permits with respect to the waters covered by the plan, including permits to federal agencies.[39]   Because it is inconceivable

---

[38] The Court of Appeals read § 505 (f) as explicitly distinguishing between effluent standards and limitations and other types of limitations or standards, on the one hand, and a requirement applicable by reason of § 313 on the other.   511 F. 2d, at 972.   In light of § 402 (k), which for purposes of § 505 makes compliance with a permit condition compliance with most of the sections imposing standards and limitations, § 505 (f)(6) is the central provision of § 505 (f) and, as outlined in the text, its salient feature is not distinguishing standards from requirements, but distinguishing standards and limitations, on the one hand, from the permit conditions embodying those standards on the other.

[39] The legislative history on the EPA's authority to suspend its permit program is meager, but Congress does not appear to have concentrated its attention on the question of partial suspension of the EPA permit program within a State.   Thus, from § 402 (b), which permits a State to submit "a full and complete description of the program it proposes to establish and administer . . . under an interstate compact" (see § 103, 33 U. S. C. § 1253 (1970 ed., Supp. IV)), it is evident that Congress clearly contemplated that the EPA might suspend issuance of § 402 (a) permits only as to some of a

that Congress would have intended federal instrumentalities to operate without permits, it is contended that Congress anticipated the state permit system to apply.

State's navigable waters—those within the scope of the interstate compact—and continue to issue permits to federal and nonfederal dischargers on other waters within the State. Nonetheless the Senate Report stated that "the bill provides that after a State submits a program which meets the criteria established by the Administrator pursuant to regulations, the Administrator shall suspend his activity in such State under the Federal permit program." S. Rep. No. 92–414, *supra*, at 71, 2 Leg. Hist. 1489. Like the States' argument that the EPA must withdraw completely from permit-issuing activity in a State with an approved program, this statement, on which the States rely, overlooks the possibility of a State's submitting a plan covering only some of its navigable waters. Although S. 2770, to which the Report referred, did include the provision permitting a State to submit a permit program to be administered under an interstate compact, see § 402 (c) (1), 2 Leg. Hist. 1689, it provided only that the EPA "shall suspend the issuance of permits under subsection (a) of this section." The phrase "as to those navigable waters subject to such program" was part of the House amendment, H. R. 11896, 1 Leg. Hist. 1058, and its inclusion in § 402 (c) (1) as enacted was not discussed in the Reports. Given this misapprehension in the Senate Report, we find the statement the States rely on to be an insufficient basis upon which to conclude, as the States urge, that the committee understood § 402 (c) (1) as if it read that upon approving a state plan the EPA must "suspend its activity in such State, or part of such State, under the Federal permit program, as to federal and nonfederal dischargers."

We are also unpersuaded by the States' argument that by limiting the EPA's authority to withdraw approval of a state program to withdrawing approval as to the entire program, Congress emphasized that only one government shall operate an NPDES permit program within a State. § 402 (c) (3), 33 U. S. C. § 1342 (c) (3) (1970 ed., Supp. IV). In our view, rejection of the EPA's proposal that the bill should be changed to permit withdrawal as to categories or classes of sources, 1 Leg. Hist. 854–855, reflected a concern that the States be given maximum responsibility for the permit system and that the EPA's review authority be restricted as much as was consistent with its overall responsibility for assuring attainment of national goals. H. R. Rep. No. 92–911, *supra*, at 127, 1 Leg.

The difficulty with this position is that under § 402, the EPA obviously need not, and may not, approve a state plan which the State has no authority to issue because it conflicts with federal law.[40] If § 313 expressly said that federal instrumentalities must comply with state discharge standards but need not secure state permits, it would be untenable to urge that a state plan which nevertheless attempts to subject federal agencies to state permit requirements would have to be approved simply because it was otherwise in compliance with § 402. As we construe § 313, this is the situation before us. By the same token, we do not think that EPA permit authority with respect to federal agencies terminates when the EPA purports to approve a state plan except for that portion of it which seeks to subject federal instrumentalities to the state permit regime.

From the outset of the EPA's administration of the NPDES and in its first regulations establishing the § 304 (h)(2) guidelines for state NPDES permit programs, see 37 Fed. Reg. 28391 (1972), the EPA has taken the position that authority to suspend issuance of EPA permits extends only "to those point sources subject to such approved program." 40 CFR § 124.2 (b) (1975). The implications that the state program would only embrace nonfederal dischargers on those navigable waters subject to the program and that the EPA

---

Hist. 814. Whether the States' maximum responsibility includes issuing permits to federal installations is, however, the question before us, and in view of the substantial review authority the EPA undoubtedly retains, see *supra,* at 208, its all-or-nothing authority to withdraw approval of a state NPDES program offers no meaningful support for the States' position that federal dischargers are required to secure state permits.

[40] Under § 402 (b), there must be ample legal authority to carry out the issuance of permits under the State's plan. See n. 15, *supra.*

was authorized to and would continue to issue permits to federal dischargers were soon made explicit in 40 CFR §§ 125.2 (a)(2), (b) (1975),[41] which provide that federal dischargers are to comply with the EPA permit program and that state NPDES permit programs do not cover federal agencies and instrumentalities. This construction by the agency charged with enforcement of the Amendments is reasonable and in the absence of any cogent argument that it is contrary to congressional intentions we sustain the EPA's understanding that the States are without authority to require federal dischargers to secure their NPDES permits.[42]

## IV

Our conclusion is that the Federal Water Pollution Control Act Amendments of 1972 do not subject federal facilities to state NPDES permit requirements with the requisite degree of clarity. Should it be the intent of Congress to have the EPA approve a state NPDES program regulating federal as well as nonfederal point sources and suspend issuance of NPDES permits as to

---

[41] 38 Fed. Reg. 13528 (1973).

[42] We also find unpersuasive on the issue before us the States' argument based upon §§ 306 (c), 308 (c), and 401 (a)(6), 33 U. S. C. §§ 1316 (c), 1318 (c), 1341 (a)(6) (1970 ed., Supp. IV), in which federal facilities are expressly exempted from certain forms of state regulation under the Amendments. The argument is that these sections demonstrate that Congress knew how to exempt federal facilities from state regulation, so that by not expressly providing that federal facilities need not secure state permits Congress clearly revealed an intention that federal facilities secure such permits. Although §§ 306, 308, and 401 are of obvious importance to the implementation of the goals and purposes of the Amendments, they are too incidental to the NPDES program for their treatment of federal facilities to offer any meaningful guidance on the question for decision in this case.

all point sources discharging into the navigable waters subject to the State's program, it may legislate to make that intention manifest.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST dissent. They agree substantially with the reasoning of the Court of Appeals for the Ninth Circuit in this case, 511 F. 2d 963, and they would, accordingly, affirm its judgment.