**SANTA MONICA BAYKEEPER,**
a non-profit corporation,
Plaintiff,

v.

**INTERNATIONAL METALS EKCO,
LIMITED, a corporation,**
Defendant.

No. CV 07–03856 DDP (FMOx).

United States District Court,
C.D. California.

Feb. 27, 2009.

Andrew L. Packard, Michael P. Lynes, Andrew L. Packard Law Offices, Petaluma, CA, Daniel G. Cooper, Layne K. Friedrich, Martin D. McCarthy, Lawyers for Clean Water, Inc., San Francisco, CA, for Plaintiff.

Emily Julia Atherton, Jason M. Booth, Richard A. Dongell, Dongell Lawrence Finney, Los Angeles, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

[Motion filed on December 19, 2008]

DEAN D. PREGERSON, District Judge.

Santa Monica Baykeeper ("Baykeeper") brings this action to enforce alleged violations of the Clean Water Act. Defendant International Metals Ekco Limited ("Ekco") owns and operates a scrap metal facility in Los Angeles. Baykeeper moves for Partial Summary Judgment, seeking a finding of liability for a total of 17,183 violations and days of violation against Kramer. After reviewing the materials submitted by the parties and hearing oral argument, the Court grants in part and denies in part the Motion for Partial Summary Judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ekco is the current and/or former owner and operator of the scrap metal recycling facility in Los Angeles that is the subject of this lawsuit ("Ekco facility"). The Ekco facility is located at Perrino Place and 2777 East Washington Boulevard. Def.'s Statement of Genuine Issues ("Def.'s SGI") at ¶ 1. Ekco's operations include scrap metal recycling and processing. Id. at ¶ 4. It is undisputed that Ekco is a scrap metal recycling facility classified as Standard Industrial Classification ("SIC") Code 5093. Id. at ¶ 2.

The Ekco facility covers approximately 138,000 square feet. Packard Decl., Ex. G (Ekco's SWPPP) at 115. The yard includes an office, scale, and operations buildings and equipment. Id. at 117. At the facility, Ekco collects, handles, sorts, processes, transports, and stores ferrous and non-ferrous scrap. Id. at 115. Other activities include vehicle fueling, maintenance, and repair work. Def.'s SGI at ¶ 5; Packard Decl., Ex. G at 118. Processing and storage occur partially indoors and partially outdoors. Def.'s SGI at ¶¶ 6–7. Quantities of scrap metal are stored in piles and open bins. Horner Decl. ¶ 45 & Ex. B at 57–71. Potential pollutant sources identified by Ekco include ferrous and nonferrous scrap storage, particles on pavement, maintenance of equipment, unwanted incoming materials, scrap processing, soil erosion and tracking, and fueling equipment. Packard Decl., Ex. G at 120.

Storm water falling on or flowing across the Ekco facility flows down four different driveways to storm drains located on East Washington Boulevard. Def.'s SGI at ¶ 8. Storm water flows untreated from Ekco's facilities into storm drains. It is undisputed that storm water discharged from the Ekco facility is regulated by California's Industrial Storm Water Permit ("General Permit"). Pl.'s Request for Judicial Notice ("RJN"), Ex. A (General Permit No. CAS000001, "Waste Discharge Requirements for Discharges of Storm Water Associated with Industrial Activities Excluding Construction Activities," Water Quality Order No. 97–03–DWQ); Def.'s SGI at ¶ 3.

## A. *Procedural History*

Baykeeper, a non-profit public benefit corporation organized under California state law, seeks to protect and enhance Los Angeles area waters for the benefit of ecosystems, for the use and enjoyment of its members, and for the public at large. Ford Decl. ¶¶ 4–5. After conducting its own investigation of the Ekco facility, Baykeeper concluded that the Ekco facility was operating in violation of the General Permit and the Clean Water Act. Baykeeper mailed statutorily required notice of intent to sue on March 10, 2007. On June 13, 2007, Baykeeper filed this suit. Baykeeper's Complaint alleges three Causes of Action for discharges of contaminated storm water and failure to comply with the requirements of California's General Industrial Permit, in violation of the Clean Water Act. Baykeeper filed this Motion for Partial Summary Judgment on December 19, 2008.

## II. BAYKEEPER'S MOTION FOR SUMMARY JUDGMENT

Baykeeper moves for a finding that the Ekco facility violated the Clean Water Act in five ways. At bottom, Ekco's opposition to summary judgment takes two approaches. First, Ekco argues that certain EPA-promulgated standards do not have the legal impact Baykeeper accords them. Second, and more broadly, Ekco argues that genuine issues of material fact pervade this suit and make summary judgment inappropriate on all grounds.[1]

### A. *Legal Standard for Summary Judgment*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"; and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

"As the party with the burden of persuasion at trial, [Baykeeper] must establish beyond controversy every essential element of its" Clean Water Act claim. *So. Cal. Gas Co. v. City of Santa Ana,* 336 F.3d 885, 888 (9th Cir.2003)(citing William W. Schwarzer, et al., California Practice Guide: Federal Civil Procedure Before Trial § 14:124–127 (2001)). All reasonable inferences from the evidence must be drawn in favor of Ekco. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Ekco can defeat summary judgment "by demonstrating the evidence, taken as a whole, could lead a rational trier of fact to find in its favor." *So. Cal. Gas Co.,* 336 F.3d at 888. As the party opposing summary judgment, Ekco must come forward with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed.R.Civ.P. 56(e); *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir.1995).

### B. *Legal Framework: The Clean Water Act and California's General Permit*

#### 1. *The Clean Water Act and Permit System*

 The objective of the Clean Water Act is to restore and maintain the "chemi-

---

1. Although Ekco lists some of these genuine issues in its Opposition, it makes this argument primarily by pointing to its Statement of Genuine Issues of Material Fact and the declarations supporting the Opposition. Opp. at 16:25–17:4.

cal, physical and biological integrity of [the] Nation's waters." 33 U.S.C. § 1251(a). In accordance with that objective, § 301(a) of the Clean Water Act makes unlawful "the discharge of any pollutant by any person,"[2] unless in compliance with a permit issued under the National Pollutant Discharge Elimination System ("NPDES"). 33 U.S.C. §§ 1311(a), 1342; *Envtl. Prot. Agency v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 205, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). "An NPDES permit serves to transform generally applicable effluent limits and other standards ... into the obligations.. of the individual discharger." *State Water Resources Control Board,* 426 U.S. at 205, 96 S.Ct. 2022. Noncompliance with a permit constitutes a violation of the Clean Water Act. 40 C.F.R. § 122.41. Authority to issue permits under the NPDES is vested in the Administrator of the Environmental Protection Agency, but that authority may be delegated to states. 33 U.S.C. § 1342(b); *Hawaii's Thousand Friends v. City and County of Honolulu,* 821 F.Supp. 1368 (D.Haw.1993). The State of California has been granted permitting authority.

■ The Clean Water Act authorizes citizen suits "against any person ... who is alleged to be in violation of ... an effluent standard or limitation under this chapter."[3] 33 U.S.C. § 1365(a)(1). The Act imposes strict liability for NPDES violations. *See Hawaii's Thousand Friends,* 821 F.Supp. at 1392 (noting that because the Clean Water Act imposes strict liability, issues of fault do "not absolve the violator from penalties, although [a lack of fault] might mitigate the amount of the

penalties assessed"). Accordingly, to establish a violation of the Act, Baykeeper need only prove that Ekco violated the terms and conditions of its NPDES permit. *Id.*

### 2. *California's General Storm Water Permit*

Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), establishes a framework for regulating pollutants associated with industrial activity. Pursuant to EPA regulations, authorized states may issue general permits or individual permits to regulate storm water discharges. *See* 40 C.F.R. §§ 122.26(c), 122.28, 123.25; *see also* 60 Fed.Reg. 50804–01. California has issued a General Permit that applies to all storm water discharges requiring a permit except construction activity.[4] RJN, Ex. A. The parties agree that the General Permit governs Ekco's facilities.

The General Permit implements the requirements of the Clean Water Act through both technology-based provisions and water quality-based standards. As relevant here, the General Permit sets out four basic requirements for permittees: (1) effluent limitations, (2) receiving water limitations, (3) the implementation of a Storm Water Pollution Prevent Plan, and (4) the development of a Monitoring and Reporting Program.

First, the General Permit sets effluent limitations. There are three basic effluent limitations. Where the EPA has set effluent limitation guidelines for an industry, storm water discharges may not exceed the specific guidelines. Gen. Permit, Effluent Limitation B(1) (RJN, Ex. A at 22–

---

**2.** As a corporation, Ekco is a "person" under the Clean Water Act. 33 U.S.C. § 1362(5).

**3.** For the purposes of § 1365, the term "effluent standard or limitation under this chapter" includes an unlawful act under

§ 1311(a), i.e., the discharge of a pollutant in violation of the General Permit. 33 U.S.C. § 1365(f); *see id.* §§ 1311(a), 1342(p).

**4.** The General Permit was issued in 1991, modified in 1992, and reissued in 1997.

23). Additionally, storm water discharges shall not contain a hazardous substance equal to or in excess of a reportable quantity listed in 40 C.F.R. Part 117 and/or 40 C.F.R. Part 302. Gen. Permit, Effluent Limitation B(2) (RJN, Ex. A at 23). Neither of these first two limitations is at issue here: the EPA has not established specific guidelines for scrap metal recycling facilities and Baykeeper does not argue that Ekco's storm water discharges were in excess of a reportable quantity. Finally, the General Permit includes a technology-based requirement. It requires that facility operators "reduce or prevent pollutants associated with industrial activity" through (1) the implementation of the best available technology economically achievable ("BAT") for toxic and non-conventional pollutants and (2) the best conventional pollutant control technology ("BCT") for conventional pollutants. Gen. Permit, Effluent Limitation B(3) (RJN, Ex. A at 23). A facility operator can comply with this requirement by developing and implementing a Storm Water Pollution Prevention Plan ("SWPPP") that (1) complies with the requirements in § A of the General Permit and (2) includes best management practices ("BMPs")[5] that achieve BAT/BCT. *Id.*

Second, the General Permit prohibits the discharge of water that causes or contributes to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Water Board's Basin Plan. Gen. Permit, Receiving Water Limitation C(2) (RJN, Ex. A at 23). The

EPA has promulgated statewide water quality standards for toxic pollutants in California through the California Toxics Rule, 40 C.F.R. 131.38 (2005) ("CTR"). The CTR sets out a numeric schedule for toxic pollutants.[6] A facility operator will not be in violation of limitation C(2) if (1) the facility operator has implemented BMPs that achieve BAT/BCT and (2) the facility operator appropriately submits a report the describes the current BMPs and revisions to those BMPs and the SWPPP. Gen. Permit, Receiving Water Limitation C(3)-(4) (RJN, Ex. A at 23–24).

Third, the General Permit requires that permittees develop and implement a Storm Water Pollution Prevention Plan that meets certain requirements. Gen. Permit, § A (RJN, Ex. A at 30). The SWPPP has two major objectives: (1) to identify and evaluate sources of pollutants and (2) to identify and implement site-specific BMPS to reduce or prevent pollutants associated with industrial activities in storm water discharges. Gen. Permit, § A(2) (RJN, Ex. A at 30–31). Section A of the General Permit catalogues with significant detail what an SWPPP must contain to comply with the General Permit. A SWPPP must contain a compliance activity schedule, a description of industrial activities and pollutant sources, a description of BMPs, drawings, maps (including a site map), and relevant copies or references of parts of other plans. *Id.* A permittee must evaluate and update the SWPPP with additional BMPs necessary to achieve compliance with the General Permit. See Gen. Per-

5. BMPs are

schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of "waters of the United States." BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spill-

age or leaks, sludge or waste disposal, or drainage from raw material storage.

40 C.F.R. § 122.2. BMPs can be structural or non-structural.

6. As discussed below, the parties dispute the applicability and impact of the CTR.

mit, Receiving Water Limitation C(3)-(4), §§ A(2) & A(9).

Fourth, the General Permit requires a permittee to develop a Monitoring and Reporting Program ("MRP"). Gen. Permit, § B. As part of the MRP, a permittee must conduct visual observations of storm water throughout the Wet Season; must collect water samples at each outfall during specific times; must analyze these samples for specific contaminants; and must file Annual Reports with the Regional Board summarizing the visual observations, results of sampling analysis, and General Permit compliance. Gen. Permit, §§ B(3)-(5), B(14). Where permittees participate in group monitoring programs, reduced monitoring requirements apply. Gen. Permit, § B(15). Because Ekco participates in the Metals Recyclers Monitoring Group ("MRMG"), Ekco must sample from at least two storm events over the five-year period of the General Permit. *Id.* § B(15)(b).

### C. *Effluent Limitation B(3) of the General Permit*

■ Baykeeper first argues that there is no genuine issue of material fact that the Ekco facility violated Effluent Limitation B(3) of the General Permit. In order to comply with Effluent Limitation B(3), a facility's SWPPP must include BMPs that achieve BAT/BCT. Gen. Permit, Effluent Limitation B(3). Baykeeper cites to the Benchmark Levels set out in the EPA Multi–Sector Permit and argues that these "provide an objective standard to determine if a permittee's BAT/BCT has been implemented." Pl.'s Mem. at 8. Because samples collected at both the Ekco facility showed pollutants in excess of these Benchmarks, Baykeeper argues, the facility was in violation of the General Permit. Ekco argues that the use of the EPA Benchmarks is inappropriate and that

there are genuine issues of material fact regarding the samples on which Baykeeper relies.

Because Baykeeper's first basis for summary judgment relies on the Court importing the EPA Benchmarks as objective measures, the Court begins by addressing the propriety of relying on those standards. The Court finds that the EPA Benchmarks are appropriate to use as objective guidelines in assessing whether Ekco has implemented BMPs that achieve BAT/BCT, but that they are only one part of such an analysis. Accordingly, as discussed below, the Court denies summary judgment on this ground.

### 1. *The EPA's Authority and Actions*

As relevant here, the Clean Water Act requires that the EPA issue certain types of guidelines, and also gives the EPA considerable discretion in how to do so.

### a. Authority to Set Effluent Limitations and Authority to Issue Permits

First, the Clean Water Act directs the EPA to set effluent limitations for certain pollutants on a national level. 33 U.S.C. § 1311(b)(2)(A). An effluent limitation is a "restriction imposed by the Director on quantities, discharge rates, and concentrations of 'pollutants' which are 'discharged' from 'point sources' into 'waters of the United States,' the waters of the 'contiguous zone,' or the ocean." 40 C.F.R. § 122.2. Effluent limitations can be numeric or technological. When the EPA sets numeric effluent limitations, the Clean Water Act requires that they reflect the application of the best available technology economically achievable. 33 U.S.C. § 1311(b)(2)(A). The EPA must identify the degree of effluent reduction attainable through the application of the best control measures and practices achievable. 33 U.S.C. § 1342(b)(2). The BAT should in-

clude treatment, process and procedure innovations, and operating methods. *Id.* In assessing BAT, the EPA is required to consider factors that include but are not limited to the age of equipment and facilities involved, process employed, engineering aspects, process changes, the cost of achieving such effluent reduction, and non-water quality environmental impact of technology, such as energy use. *Id.* For some industries, the EPA has promulgated regulations, including numeric effluent limits for storm water discharges, that apply on a national level. *See* 40 C.F.R., Subchapter N. Scrap recycling facilities are not among those industries regulated by Subchapter N.

Additionally, as mentioned above, § 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p), grants the EPA the authority to issue permits regulating pollutants and discharges, as well as the discretion to delegate its permitting authority to approved states. Unless the EPA chooses to regulate on a national level, an authorized state's permit will govern storm water discharges in that state.

### b. The EPA's Multi–State General Permit ("MSGP")

Pursuant to its permitting authority under § 1342(p), the EPA has promulgated the Multi–Sector General Permit for Stormwater Discharges Associated with Industrial Activity ("MSGP"). *See* Final National Pollutant Discharge Elimination System Storm Water Multi–Sector General Permit for Industrial Activities, 60 Fed. Reg. 50804 (September 29, 2005); Final Reissuance of National Pollutant Discharge Elimination System (NPDES) Storm Water Multi–Sector General Permit for Industrial Activities, 65 Fed.Reg. 64746–01 (October 30, 2000); Final Nation-

al Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Industrial Activities, 73 Fed.Reg. 56572–01 (September 29, 2008) (referring to http://cfpub.epa.gov/npdes/stormwater/msgp.cfm for the text of the 2008 MSGP). The MSGP only applies to non-delegated States; it therefore does not apply to California industrial facilities, except for those located on Indian lands.[7]

Overall, the MSGP sets out specific standards, requirements for an SWPPP, and requirements for monitoring and reporting. Among its other provisions, the MSGP sets out benchmark levels for certain pollutants to use as a guideline in analyzing facilities' compliance with the Clean Water Act, and directs facilities to conduct monitoring on the basis of those benchmark levels. 1995 MSGP, 60 Fed. Reg. at 50824–25; 2000 MSGP, 65 Fed. Reg. at 64836–39; 2008 MSGP at 102.

As set forth in the MSGP, Benchmark levels are distinct from the effluent limitations described above. According to the various versions of the MSGP, benchmarks are the pollutant concentrations above which EPA determined represent a level of concern. The level of concern is a concentration at which a storm water discharge could potentially impair, or contribute to impairing, water quality or affect human health from ingestion of water or fish. The benchmarks are also viewed as a level that, if below, a facility presents little potential for water quality concern. As such, the benchmarks also provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented. The benchmark concentrations are not effluent limitations and should not be interpreted or

---

7. *See* 2000 MSGP, 65 Fed.Reg. at 64803; 2008 MSGP, Appendix C, C–4, available at

http://cfpub.epa.gov/npdes/stormwater/msgp. cfm.

adopted as such. These values are merely levels which EPA has used to determine if a storm water discharge from any given facility merits further monitoring to ensure that the facility has been successful in implementing a SWPPP.

2000 MSGP, 65 Fed.Reg. at 64766–67; *see id.* at 64816 ("The results of benchmark monitoring are primarily for your use to determine the overall effectiveness of your SWPPP in controlling the discharge of pollutants to receiving waters. Benchmark values, included in Part 6 of this permit, are not viewed as effluent limitations. An exceedance of a benchmark value does not, in and of itself, constitute a violation of this permit. While exceedance of a benchmark value does not automatically indicate that violation of a water quality standard has occurred, it does signal that modifications to the SWPPP may be necessary. In addition, exceedance of benchmark values may identify facilities that would be more appropriately covered under an individual, or alternative general permit where more specific pollution prevention controls could be required."); 1995 MSGP, 60 Fed.Reg. at 50824–25 (same); 2008 MSGP at 35 ("The benchmark concentrations are not effluent limitations; a benchmark exceedance, therefore, is not a permit violation. Benchmark data are primarily for your use to determine the overall effectiveness of your control measures and to assist you in knowing when additional corrective action(s) may be necessary to comply with the effluent limitations in Part 2."). Where samples indicate concentrations in excess of benchmarks, the MSGP generally appears to require that a company evaluate its control measures and determine whether modifications are necessary. *See, e.g.,* 2008 MSGP at 35–37 (§ 6.2.1).

Benchmark limitations and effluent limitations also appear to have different relationships to BAT/BCT. As described above, by statute, effluent limitations are inextricably linked to BAT/BCT. *See* 33 U.S.C. §§ 1311(b)(2)(A), 1342(b)(2). EPA Benchmarks, on the other hand, are not as linked. Rather, it appears that the Benchmarks levels are based on information such as concentration values for aquatic life, secondary wastewater treatment regulations, and human health criteria. *See* 1995 MSGP, 60 Fed.Reg. at 50825; 2000 MSGP, 65 Fed.Reg. at 64767 (citing to 1995 MSGP). While numeric effluent limitations must take into account industry-specific BAT/BCT, the numeric guidelines reflected in the Benchmark levels do not vary among industries. The pollutants an industry must monitor does vary by industry, however; the EPA has determined whether an industry presents a risk for certain types of pollutants based on a statistical analysis of samples. *See id.*

According to the MSGP, scrap recycling facilities, which are Standard Industrial Classification Code 5093, must monitor seven chemicals. There are no numeric effluent limitations for scrap recycling facilities set forth either in 40 C.F.R. Subchapter N or in the MSGP.

### 2. Effluent Limitations in California's General Permit

The parties agree that California's General Permit does not by its terms incorporate the MSGP's Benchmark levels in Effluent Limitation B(3). The General Permit provides that for facilities regulated by 40 C.F.R. Subchapter N, "compliance with the effluent limitation guidelines constitutes compliance with BAT and BCT for the specified pollutants and must be met comply with this General Permit." Gen. Permit, Fact Sheet at VIII (RJN, Ex. A at 14); *id.*, Effluent Limitation B(1) (RJN, Ex. A at 22). For industries that are not among the industrial categories listed in 40 C.F.R. Sub-

chapter N, like the scrap recycling facilities at issue here, the General Permit provides that "it is not feasible at this time to establish numeric effluent limitations.... Therefore, this General Permit allows the facility operator to implement best management practices (BMPs) to comply with the requirements of this General Permit." Gen. Permit, Findings ¶ 9 (RJN, Ex. A at 21). The lack of an objective standard in the General Permit has been a source of criticism. *See* Booth Decl., Ex. B. at 80. The General Permit does require, however, that permittees incorporate BMPs "that achieve BAT/BCT." Gen. Permit, Effluent Limitation B(3).

### 3. *Role of EPA Benchmark Levels in the Effluent Limitation B(3) Analysis*

Baykeeper urges the Court to look to the EPA Benchmarks as "objective standards for determining the sufficiency of BMPs." Reply at 3. Baykeeper asserts that the numerous samples showing that discharges from Ekco's facility repeatedly exceeded the Benchmark limits, "coupled with photographic and documentary evidence presented" in support of its motion, leave no genuine issue of material fact that Ekco's BMPs did not achieve BAT/BCT, as required by the General Permit. Ekco argues that adopting Baykeeper's approach inappropriately treats the benchmarks as enforceable guidelines, even though the General Permit does not specifically incorporate them as such. Baykeeper accuses Ekco of mischaracterizing its argument. Although Baykeeper asserts that it does not "elevate[ ] EPA Benchmark levels to 'enforceable numeric limits,'" *see* Reply at 3, there is limited, if any, practical difference between that and what Baykeeper asks the Court to do in its

first argument—to grant summary judgment based *solely* on samples that are above the benchmark levels. *See* Pl.'s Mem. at 10 ("Each of these discharges of polluted storm water in excess of EPA Benchmarks is a separate violation of the General Permit[.]").

The Court holds that the EPA Benchmarks are relevant guidelines that should be used to evaluate the efficacy of a facility's BMPs, but that samples in excess of those benchmarks do not necessarily constitute a violation of the General Permit.[8] There can be no reasonable dispute that the Benchmarks are relevant to the inquiry as to whether a facility implemented BMPs. *Cf. Waterkeepers Northern California v. AG Industrial Mfg. Inc.*, 375 F.3d 913, 919 n. 5 (9th Cir.2004) (suggesting that the plaintiff appropriately pointed to EPA Benchmark values "as evidence to support its claim that [the defendant] failed to implement adequate BMPs"). As Baykeeper noted in its Reply, the Benchmarks are often used as an objective guideline by those investigating compliance. Indeed, Timothy Simpson, Vice President and principal engineer for Geomatrix Consultants, the group leader for the Metals Recyclers Monitoring Group, testified at his deposition that the MRMG uses the EPA's Benchmarks to determine which clients likely need to implement "additional measures" to remain in compliance with the General Permit. *See* Simpson Decl., ¶ 1; Simpson Depo. at 35:6–36:14. The MSGP contemplates using the Benchmark levels in precisely this way. . *See* pp. 12–15, *supra;* 2000 MSGP, 65 Fed.Reg. at 64766–67 ("[T]he benchmarks also provide an appropriate level to determine whether a facility's storm water pollution prevention measures are successfully implemented.").

---

**8.** At oral argument, Baykeeper agreed that this was the proper approach.

Although the Benchmark levels are useful objective guidelines, the Court is not persuaded it would be appropriate to hold that samples showing concentrations in excess of the Benchmark levels constitute a violation of Effluent Limitation B(3) simply by virtue of exceeding those Benchmark levels. Doing so would effectively—and inappropriately—turn these Benchmarks into numeric effluent limitations. First, the General Permit neither specifically incorporates the Benchmark levels nor cites to them as helpful guidance. Second, the MSGP indicates that Benchmark levels are to be used as signals that an SWPPP may need adjusting, not as a bright-line proxy for compliance or noncompliance. Moreover, Effluent Limitation B(3) provides that BMPs must "achieve BAT/BCT." As discussed above, while effluent limitations are inextricably linked with BAT/BCT, as far as the Court can tell, EPA Benchmarks are not so linked. Without a direct link to BAT/BCT, it would be problematic to use the Benchmark levels to conclusively determine whether a facility's "BMPs achieve BAT/BCT."

Instead, the Court holds that a more comprehensive approach is necessary. The Clean Water Act, the General Permit, and applicable regulations suggest that the approach to compliance with permits requires assessments based both on industry-wide standards and on an individualized and flexible approach. For example, when the EPA sets effluent limits, it does so on an industry-by-industry basis. *See* 33 U.S.C. § 1311(b)(2)(A) (requiring that effluent limitations be set for "categories and classes of point sources"). However, the substance of each SWPPP, including

the appropriate BMPs, is developed facility-by-facility. *See* Gen. Permit, § A. The Court does not doubt that an objective standard has benefits, including the ease of administration and the ease of determining when site violates the General Permit. Repeated and/or significant exceedances of the Benchmark limitations should be relevant to this determination. With respect to Effluent Limitation B(3), however, the General Permit appears to require a more comprehensive look at the BAT/BCT for the industry to determine whether a specific site's BMPs achieve BAT/BCT.

Baykeeper's first ground for summary judgment rests entirely on the fact that samples repeatedly show effluent limitations in excess of the benchmark levels. *See* Pl.'s Mem. at 9–10.[9] Baykeeper's argument draws from sampling at the Ekco facilities and the opinion of Dr. Horner. As noted above, the Court agrees that sampling orders of magnitude in excess of the benchmark levels is evidence supporting Baykeeper's contention that Ekco did not have BMPs that achieve BAT/BCT. As discussed above, however, this evidence in and of itself does not establish a violation of Effluent Limitation B(3). Dr. Horner opined that "modern stormwater treatment devices can produce effluents of higher quality for many" of the contaminants set by the MSGP, and that, accordingly, "the EPA benchmarks convey some 'benefit of the doubt' on treatment capabilities to dischargers." Horner Decl. ¶ 21. According to Dr. Horner, because they accord some benefit of the doubt, these benchmarks "are in no way excessively stringent or infeasible to meet." *Id.* Although both sampling and Dr. Horner's opinion support Baykeeper's Motion, with-

---

**9.** While Baykeeper's Reply suggests that this argument is also based on photographs and documentary evidence presented, its argument rests on sampling in excess of the

Benchmark limits as opposed to an analysis of the BAT/BCT available and a contrast to those used by Ekco.

out a more comprehensive discussion of the BAT/BCT, the Court cannot find that no genuine issue of material fact remains. The SWPPP and Cobb's testimony reflect some BMPs used by the Ekco facilities. *See* Packard Decl., Ex. G at 121–26; Atherton Decl., Ex. B at 18–21. While the Court finds it doubtful that BMPs such as sweeping achieve BAT/BCT, the Court has no real discussion on these issues before it in reference to Effluent Limitation B(3). Where Baykeeper's motion included no discussion of how Ekco's BMPs compared with the BAT/BCT, the Court is not convinced that samples in excess of the Benchmark levels were sufficient to shift the burden to Ekco to dispute this claim. *See* Reply at 11–12. (To the extent Baykeeper discusses these issues with reference to requirements of the SWPPP, the Court addresses liability on that ground below.)

### D. *Receiving Water Limitation C(2) of the General Permit*

■ Next, Baykeeper moves for summary judgment on the ground that the discharge from the Ekco facility is in excess of water quality standards, and therefore in violation of the Receiving Water Limitation C(2) of the General Permit. Ekco argues that Baykeeper inappropriately relies on the California Toxics Rule. The Court holds that the California Toxics Rule is a water quality standard that applies to Ekco, and that summary judgment is warranted as to liability on that ground.

#### 1. *CTR as a Water Quality Standard Under Receiving Water Limitation C(2)*

The General Permit's Receiving Water Limitations provides that storm water discharges "shall not adversely impact human health or the environment." Gen. Permit, Receiving Water Limitation C(1). In particular, Receiving Water Limitation C(2) provides that storm water discharges "shall not cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Water Board's Basin Plan." *Id.*, Receiving Water Limitation C(2).

The California Toxics Rule ("CTR"), 40 C.F.R. 131.38, is an applicable water quality standard. After a California court overturned the State's water quality control plan (and pursuant to § 303 of the Clean Water Act, 33 U.S.C. § 1313), the EPA promulgated the CTR "to fill a gap in California water quality standards" that had existed for several years in the absence of a State water quality control plan. Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California, 65 Fed. Reg. 31682 (May 18, 2000). The EPA's Summary of the Final Rule provides that "[t]hese Federal criteria are legally applicable in the State of California for inland surface waters, enclosed bays and estuaries for all purposes and programs under the Clean Water Act." *Id.* "All waters (including lakes, estuaries, and marine waters) . . . are subject to the criteria promulgated today. Such criteria will need to be attained at the end of the discharge pipe, unless the State authorizes a mixing zone." *Id.* at 31701. For the pollutants present in the discharges from the Ekco facilities, the following pollutant concentrations apply (assuming a receiving water hardness of 100 mg/L as CaCO3 and all as dissolved quantities): lead—0.065 mg/L; copper—0.013 mg/L; zinc—0.120 mg/L; and cadmium—0.0043 mg/L. 40 C.F.R. 131.38(b)(1).[10]

---

10. The CTR levels are lower than benchmark levels. *See* 65 Fed.Reg. at 31701 ("EPA is

Ekco argues that the CTR is not applicable here for two reasons, neither of which the Court finds persuasive. First, Ekco argues that, according to California's "Policy for Implementation of Toxics Standards for Inland Surface Waters, Enclosed Bays, and Estuaries of California," the CTR does not apply to individual dischargers. *See* Booth Decl., Ex. A. Ekco's reading of the CTR and the Implementation Policy is unavailing. The CTR expressly applies to "all waters" for "all purposes and programs under the Clean Water Act." *See* 65 Fed.Reg. at 31682, 31701. By noting that the Implementation Policy does not apply to storm water discharges, *see* Booth Decl., Ex. A at 16 n. 1, the Implementation Policy does not purport to exempt storm water dischargers from the limits imposed by the CTR, a federal regulation. Rather, the Implementation Policy suggests that those issues are regulated by the General Permit. The General Permit requires adherence to water quality standards.[11] Second, Ekco appears to argue that its contribution to impairment by pollutants would be small. However, the CTR criteria apply "end of the discharge pipe, unless the State authorizes a mixing zone." 65 Fed.Reg. at 31701. The General Permit authorizes no mixing zone.

In sum, the CTR is a water quality standard in the General Permit, Receiving Water Limitation C(2). A permittee violates Receiving Water Limitation C(2) when it "causes or contributes to an exceedance of" such a standard, including the CTR. The General Permit provides that a facility operator "will not be in violation of Receiving Water Limitation C(2) as long as the facility operator has implemented BMPs that achieve BAT/BCT" and follows a reporting procedure. Gen. Permit, Receiving Water Limitation C(3).

### 2. *Baykeeper's Samples*

Baykeeper rests its C(2) argument on sampling by Ekco in November 2007 and by Baykeeper on February 11, 2007, February 22, 2007, April 20, 2007, November 30, 2007, and January 6, 2008. While Ekco cannot object to the quality of its own sampling, *See Sierra Club v. Union Oil Co. of Cal.*, 813 F.2d 1480, 1492 (9th Cir.1987), *vacated by* 485 U.S. 931, 108 S.Ct. 1102, 99 L.Ed.2d 264, *judgment reinstated in* 853 F.2d 667 (9th Cir.1988) ("when a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error"), it argues that Baykeeper's samples may not be reliable.

Ekco's objection to the reliability of these samples is twofold. First, Ekco notes that Ekco did not provide access or permission to sample storm water at its

---

aware that the criteria promulgated today for some of the priority toxic pollutants are at concentrations less than EPA's current analytical detection limits. Analytical detection limits have never been an acceptable basis for setting water quality criteria since they are not related to actual environmental impacts."). Pursuant to § 1342(p)(3)(A) (which incorporates the requirements of § 1311), "industrial storm-water discharges shall achieve any more stringent limitation, including those necessary to meet water quality standards, treatment standards or schedules of compliance, established pursuant to any State law or regulation." *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1164–65 (9th Cir.1999)(internal quotation marks and alterations omitted).

**11.** This interpretation is consistent with the approach taken by the Regional Water Quality Control Board for the Los Angeles Region in its 2001 LA County MS4 Permit. *See* Packard Reply Decl., Ex. B at 63 (defining "Water Quality Standards and Water Quality Objectives" to mean "water quality criteria contained in ... the California Toxics Rule").

facility. Cobb Decl. ¶ 7. According to Simpson, if such samples were taken off of Ekco Metals' premises, "they may have been tainted by water from other sources." Simpson Decl. ¶ 21.[12] Second, Ekco argues that the existence of fecal coliform in the samples "indicates the possibility of contamination of the samples by water from other sources." Simpson Decl. ¶ 22. Carlos Carreon, who collected Baykeeper's samples, provided a detailed explanation as to his background and experience with water quality and environmental engineering here. Carreon Decl. ¶¶ 3–4, Ex. A. Additionally, Carreon's description of the collection of the water samples contains significant detail, providing a narrative description of the location and process Carreon used, as well as Carreon's notes. See, e.g., Carreon Decl. ¶ 14, Ex. D at 42. Ekco's witnesses do not specifically address either Carreon's qualifications or his sampling technique.[13] Rather than address Carreon's specific descriptions of the sampling conditions, Simpson's declaration contains only a conclusory assertion that the water sampling was performed "under undocumented conditions" and that this, combined with the presence of fecal coliform, suggests that the samples could have been tainted. Simpson Decl. ¶ 19. Simpson's assertion as to the "undocu-

mented" nature of Carreon's samples is without merit in light of the significant detail provided by Carreon. Additionally, Simpson's conclusory statement that the presence of fecal coliform "possibly" indicates contamination does not give rise to a genuine issue of material fact as to the validity of these samples. Id. ¶ 22. The only supporting evidence on which Simpson relies is a similarly conclusory statement from David Cobb. See Cobb Decl. ¶ 7 ("We do not engage in any activity which would lead to the presence of fecal coliform ... to appear in samples taken of storm water discharged from the Ekco Metals' facility."). Simpson does not, for example, explain why, based on Carreon's detailed description of his sampling techniques, those techniques were improper. Simpson's conclusory statements are insufficient to raise a triable issue of fact as to these samples. See F.T.C. v. Publishing Clearing House, 104 F.3d 1168, 1171 ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.").

### 3. Violations at the Ekco Facility

Ekco cannot dispute the information contained in its annual reports or reports

12. Baykeeper has objected to the Simpson Declaration on the basis of Federal Rule of Evidence 702 and Federal Rule of Civil Procedure 56(e). See Pl.'s Objections to Evidence. Though styled as an attack on Simpson's entire declaration, Baykeeper's Rule 702 objection appears primarily to challenge Simpson's "qualifi[cations] as an expert by knowledge, skill, experience, training, or education" to opine on the relevance or interpretation of EPA Benchmarks and CTR. The Court does not read Baykeeper's objection to bear on Simpson's qualifications to testify the propriety of certain samples or how to sample, and does not read his deposition testimony to be inconsistent with his declaration on these points. Baykeeper does not argue, for instance, that Simpson has not stated the factu-

al basis for his opinion. See Walton v. U.S. Marshals Service, 492 F.3d 998, 1008 (9th Cir.2007) (In this circuit, "[e]xpert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not." (internal quotation marks omitted)).

13. Ekco filed objections to Carreon's declaration on February 13, 2009. The objections the sampling paragraphs assert lack of personal knowledge in violation of Federal Rule of Evidence 602. The Court overrules these objections.

to the MRMG. *See Sierra Club,* 813 F.2d at 1492. The sampling data for November 30, 2007 indicates levels above the CTR standards. Horner Decl. ¶¶ 29–38. On November 30, 2007, Ekco Metals conducted samples in Yards 2 and 3. It is undisputed that both samples had concentrations of copper, zinc, and lead significantly above the CTR standards for these pollutants. Horner Decl., Ex. C at 79–80; 40 C.F.R. 131.38(b).

| Parameter | Location | Result (mg/L) | CTR |
|---|---|---|---|
| Copper | Yard 2 | 36.3 | 0.013 |
| Copper | Yard 3 | 5.12 | 0.013 |
| Lead | Yard 2 | 10.2 | 0.065 |
| Lead | Yard 3 | 6.39 | 0.065 |
| Zinc | Yard 2 | 11.9 | 0.12 |
| Zinc | Yard 3 | 31.1 | 0.12 |

Samples taken by Baykeeper on February 11, 2007, February 22, 2007, April 20, 2007, November 30, 2007, and January 6, 2008 also indicated excesses of CTR standards for these pollutants, though of lower magnitudes. *See* Horner Decl., Ex. C at 74–84.

Because these numbers exceed the applicable WQS, the Court finds that there were violations of Receiving Water Limitation C(2) at the Ekco facility. Ekco does not dispute Dr. Horner's assertion that Ekco did not submit a report to the appropriate regional water board, in compliance with Receiving Water Limitation C(3). *See id.* at ¶ 31. Thus, that safe harbor undisputably cannot apply. The Court will defer ruling the number of violations until a later time, such as in conjunction with appropriate damages.

### E. *Storm Water Pollution Prevention Plans*

Baykeeper next argues that Ekco's SWPPP is inadequate in violation of the General Permit. Section A of the General Permit sets forth the requirements for site maps. The SWPPP has "two major objectives: (a) to identify and evaulate sources of pollutants" and "(b) to identify and implement site-specific best management practices (BMPs) to reduce or prevent pollutants associated with industrial activities in storm water discharges." Gen. Permit, § A(2). Although the SWPPP requirements "are designed to be sufficiently flexible to meet the needs of various facilities," there are nevertheless mandatory components. As relevant here, the SWPPP must include: (1) a Site Map, Gen. Permit § A(4); (2) a description and assessment of potential pollutant sources, *id.* §§ A(6)-(7); and (3) a narrative description of the BMPs to be implemented at the facility for each potential pollutant, *id.* § A(8). Additionally, the SWPPP must be evaluated once a year to determine whether revisions are appropriate. *Id.* § A(9). Baykeeper challenges Ekco's SWPPP in three ways.

### 1. *Failure to Incorporate BMPs that Comply with the General Permit*

Baykeeper argues that the SWPPP fails to incorporate BMPs that comply with the General Permit's requirement for SWPPPs. According to the General Permit, an SWPPP must include a description of the storm water BMPs to be implemented. Gen. Permit, § A(8). Those BMPs "shall be developed and implemented to reduce or prevent pollutants in storm water discharges." *Id.* The General Permit requires that facility operators consider non-structural and structural BMPs. According to § A(8)(a) of the General Permit, "[n]on-structural BMPs generally consist of processes, prohibitions, procedures, schedule of activities, etc., that prevent pollutants associated with industrial activity from contacting with storm water discharges." The General Permit provides that "[f]acility operators should consider all possible non-structural BMPs options

before considering additional structural BMPs." *Id.* "Where non-structural BMPs . . . are not effective, structural BMPs shall be considered. Structural BMPs generally consist of structural devices that reduce or prevent pollutants in storm water discharges." *Id.* at § A(8)(b). In determining whether BMPs are effective, the General Permit suggests that visual observations, inspections, and sampling results are all relevant. *Id.* at § A(9).

Baykeeper argues that the non-structural BMPs have not been effective, and that the SWPPP has not incorporated structural BMPs as required in such a situation. Baykeeper's argument rests on the combination of storm water samples and visual observations by its investigators and in Ekco's reports. *See* Horner Decl. ¶¶ 28–41 & Ex. C at 79–80; Carreon Decl. ¶ 10 & Ex. B; Ford Decl. ¶¶ 36–37. As mentioned above, the General Permit defines non-structural BMPs as those that prevent pollutants from coming into contact with storm water. There is evidence that Ekco uses non-structural BMPs, *see* Packard Decl., Ex. G, but Ekco has not presented evidence creating a genuine issue as to whether these BMPs were fully effective in the face of Baykeeper's evidence to the contrary.[14] Where non-structural BMPs are ineffective, i.e., do not prevent pollutants from coming into contact with storm water, an SWPPP must include structural BMPs. Gen. Permit, § A(8)(b). Though Ekco disputes whether it *actually used* structural BMPs or was implementing BMPs that achieve BAT/BCT, *see* Atherton Decl., Ex. B at 18–20, it is undisputed that the SWPPP itself does not include structural BMPs. Accordingly, the Court finds that Ekco's SWPPP is in violation of § A(8) of the General Permit.

### 2. *Site Map*

■ ˙ Baykeeper also argues that the Ekco SWPPP violates the General Permit because its site map fails to meet the requirements of the General Permit. The General Permit requires that the Site Map include all areas of industrial activity; ˙locations where materials are directly exposed to precipitation; an outline of all impervious areas of the facility; and all areas subject to soil erosion. Gen. Permit § A(4)(a)-(e). Baykeeper argues that the site map omits (1) many of the places where scrap metal is stored without cover and (2) all areas of shipping and receiving, fueling, vehicle and equipment maintenance and waste treatment. The Court finds that there are genuine issues as to whether the site map complies with these requirements. The site map indicates areas for exposed metal, *see* Packard Decl., Ex. G at 117, and the cited pages of the Horner Declaration include pictures of exposed scrap metal without identification as to the particular yards, *see* Horner Decl., Ex. B at 57–64. Additionally, the site map indicates places for parking and loading. Packard Decl., Ex. G at 117. Taking this evidence in Ekco's favor, the Court finds that genuine issues remain as to this violation.

### 3. *Revisions to SWPPP to Include Adequate BMPs*

■ Baykeeper argues that Ekco has failed to update the SWPPP to include adequate BMPs at the Ekco facility, as required by §§ A(2) & A(9). It is undisputed that there has been no revision to the SWPPP, but Ekco argues that it was not required to update. While the Court finds that there are genuine issues of ma-

---

**14.** The declarations on which Ekco relies state in a conclusory fashion that the BMPs

are adequate.

terial fact as to whether the facility was using BMPs that achieve BAT/BCT (i.e., whether it was actually using structural BMPs), the Court has already found that the non-structural BMPs were inadequate. Accordingly, the Court finds that revisions to the SWPPP were necessary.

### 4. *Summary*

In sum, the Court finds that summary judgment is warranted on violations of §§ A(8) and A(9) of the General Permit.

### F. *Monitoring and Reporting Plans*

■ Section B of the General Permit sets out requirements for monitoring and reporting storm water. These monitoring and reporting requirements are aimed at (1) ensuring that storm water discharges are in compliance with discharge prohibitions, effluent limitations, and receiving water limitations, and (2) assisting in the evaluation and analysis of the BMPs. *See* Gen. Permit, § B(2). By participating in the MRMG, Ekco is subject to reduced monitoring. *Id.* at § B(15). Members of the group monitoring program must conduct storm water sampling and analysis in compliance with the following requirements: (1) they must be collected from two storm events at each site during the five-year cycle that occur during scheduled facility hours and that are preceded by at least three working days without storm water discharges; (2) the samples must be taken during the first hour of discharge; (3) at least one sample must be collected from the first storm event of a particular wet season (October 1 through May 30); (4) samples must be analyzed for specific contaminants; and (5) samples must be analyzed for toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities. *Id.* at §§ B(5)(a)-(b).

It is undisputed that Ekco sampled only once during the relevant period, on November 20, 2007. Genuine issues of material fact remain as to whether qualifying events took place at the Ecko facility.

### G. *Annual Reports*

Finally, Baykeeper moves for summary judgment on the basis that Ekco failed to self-report any noncompliance, in violation of § A(9) of the General Permit. As this argument appears primarily to rely on the adequacy of Ekco's BMPs, the Court finds summary judgment inappropriate on this ground.

### III. RULE 56(f) REQUEST

■ Although Ekco has defended Baykeeper's Motion for Summary Judgement, it has also filed a request pursuant to Federal Rule of Civil Procedure 56(f) for a continuance of this motion. While Ekco presents this request as an alternative for the court "if the Court is not inclined to deny the motion based on the materials before it now." Opp. at 23–24.

Rule 56(f) provides that if a party opposing a motion for summary judgment "shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order." Fed.R.Civ.P. 56(f). "A party requesting a continuance pursuant to Rule 56(f) must identify by affidavit the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1100 (9th Cir.2006). A district court is within its discretion to deny a Rule 56(f) request "if the movant has failed diligently to pursue discovery in the past." *Chance*

*v. Pac–Tel Teletrac, Inc.,* 242 F.3d 1151, 1161 n. 6 (9th Cir.2001) (quoting *Nidds v. Schindler Elevator Corp.,* 113 F.3d 912, 920 (9th Cir.1996)) (internal quotation marks omitted). That said, "a district court should continue a summary judgment motion upon a good faith showing by affidavit that the continuance is needed to obtain facts essential to preclude summary judgment." *California v. Campbell,* 138 F.3d 772, 779 (9th Cir.1998).

Supported by an affidavit from counsel for Ekco, Ekco makes its Rule 56(f) request on two grounds. First, Ekco asserts that it did not know that Baykeeper would be relying on the water samples it collected in this Motion for Summary Judgment. Second, Ekco asserts that it was not aware Baykeeper would be using Dr. Horner as an expert witness and has not had the opportunity to cross-examine him.

Discovery is not yet closed in this case. According to the current scheduling order, to which the parties stipulated, Fact Discovery Cut Off is March 17, 2009. *See* Order Re Stipulation Setting Pretrial and Trial Schedule, Docket No. 37. Expert disclosures and reports are due March 31, 2009, rebuttal expert reports are due May 5, 2009, and expert discovery cut-off is May 7, 2009. *Id.* The last day to hand-serve Motions is April 7, 2009, and the Motion cut-off is April 28, 2009. *Id.*

To the extent Ekco's Rule 56(f) motion rests on Baykeeper's use of its own samples, Ekco's request lacks merit. According to Baykeeper's counsel, although it has been over a year and a half since Baykeeper filed this case, Ekco has conducted no discovery. Packard Reply Decl. ¶ 7. In Baykeeper's Rule 26(a) Initial Disclosures, dated January 29, 2008, Baykeeper specifically disclosed data reports relating to storm water sampling it conducted at Kramer's facilities on February 11, 2007, February 22, 2007, and November 30,

2007. Packard Reply Decl. ¶ 5. Likewise, Tom Ford, Carlos Carreon, Meredith McCarthy, and Jose Couce have been designated as witnesses since those initial disclosures. *Id.* Ekco's suggestion that it did not expect Baykeeper to rely on this information because of a conversation in which Kramer's counsel criticized Baykeeper's samples, *see* Booth Aff. ¶¶ 3–4, does not justify continuance. *See Chance,* 242 F.3d at 1161 n. 6.

Ekco's challenge as to Dr. Horner is also unavailing. As mentioned above, under the current Scheduling Order, stipulated by the parties, expert reports and disclosures are not due until March 31, 2009, rebuttal expert reports are due May 5, 2009, and expert discovery cut-off is May 7, 2009. The last day to hand-serve Motions is April 7, 2009, and the Motion cut off is April 28, 2009. Ekco has had ample time to take Dr. Horner's deposition. Additionally, Ekco's insistence that it has not had a chance to cross-examine Dr. Horner, though perhaps relevant, is unconvincing here. The dates provided by the parties' own stipulated scheduling order suggest that the parties did not necessarily contemplate pre-Summary Judgment depositions of experts. More importantly, however, Ekco has failed to point to specific facts that may be provided in such a deposition that would undermine summary judgment here.

This is not a case where discovery has just begun or the moving party has sprung new information on the defendant at the last minute. Although Ekco is correct that discovery has not yet been completed, the Court finds its explanations insufficient in the context of this case. Thus, the Court denies the Rule 56(f) request.

## IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Baykeep-

er's Motion for Partial Summary Judgment.

IT IS SO ORDERED.